**RESERVE SUPPLY CORPORATION,**
Plaintiff,

v.

**OWENS–CORNING FIBERGLAS CORPORATION and Certainteed Corporation, Defendants.**

**No. 83 C 3766.**

United States District Court,
N.D. Illinois, E.D.

Dec. 17, 1990.

---

**7.** There are three exceptions to this mandate which are specified in the statute. None applies to this case.

Richard P. Campbell, Anthony DiVencenzo, Campbell & DiVincenzo, Robert N. Sodikoff, Greenberg, Keele, Lunn & Aronberg, Chicago, Ill., for Reserve Supply Corp.

Earl L. Pollock, Robert T. Joseph, Jeffrey L. Dorman, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for Owens–Corning Fiberglas Corp.

Douglas F. Fuson, David F. Graham, Shelley C. Chapman, Sidley & Austin, Chicago, Ill., for CertainTeed Corp.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

In this three-count action, the plaintiff, Reserve Supply Corp. ("Reserve"), alleges horizontal price-fixing and discriminatory pricing in the residential fiberglass insulation industry. Reserve is a cooperative with a membership of approximately 379 lumber dealers. The defendants, Owens–Corning Fiberglas Corporation ("Owens–Corning") and CertainTeed Corporation ("CertainTeed"), both manufacture and sell fiberglass insulation products.

The defendants' motion for summary judgment as to Counts I and III of the complaint are before the Court. Count I alleges that Owens–Corning and CertainTeed violated the Sherman Act by conspiring with each other, as well as other unnamed manufacturers, to fix prices in the residential fiberglass insulation industry. 15 U.S.C. § 1. Count III charges the defendants with unfair competition under the Illinois Consumer Fraud and Deceptive Business Practices Act. Ill.Rev.Stat. (1984) ch. 121½, ¶ 261 *et seq.* Additionally, Owens–Corning individually seeks summary judgment as to Count II of the complaint. Count II alleges that Owens–Corning violated the Robinson–Patman Act by selling fiberglass insulation products to Reserve's competitors for less than the price that Owens–Corning charged Reserve.[1] 15 U.S.C. § 13(a). For the reasons set forth below, the court grants the defendants' motions for summary judgment.

---

1. CertainTeed's motion for summary judgment as to Count II of the complaint was granted by Judge Duff prior to the reassignment of this case. *Reserve Supply Corporation v. Owens–Corning Fiberglas Corporation,* 639 F.Supp. 1457, 1467–68 (N.D.Ill.1986). Thus, Owens–Corning is the only remaining defendant named in this count.

## I. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is available when the pleadings and supplemental materials present no issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court must construe the facts alleged in the complaint in the light most favorable to the party opposing the motion for summary judgment. *Oxman v. WLS-TV*, 846 F.2d 448, 452 (7th Cir.1988). Summary judgment, however, "may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate price competition." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir.1989), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594–95, 106 S.Ct. 1348, 1359–60, 89 L.Ed.2d 538 (1986). Therefore, an antitrust plaintiff opposing summary judgment must present evidence that tends to exclude the possibility that the defendant's conduct was as consistent with competition as with illegal conduct. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). An antitrust plaintiff "must show that an inference of antitrust conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed the plaintiff." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356. Direct or circumstantial evidence should be presented which reasonably tends to prove a "meeting of the minds" or a "conscious commitment to a common scheme designed to achieve an unlawful objective" to exclude the possibility that defendants were acting independently. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471 (citation omitted). It is with these standards in mind that the court addresses the defendants' motions.

### B. *Count I Sherman Act Violations*

▆ Reserve characterizes the fiberglass building insulation industry as oligopolistic, where prices do not fluctuate purely in relation to supply and demand. Reserve alleges that only the existence of joint action by CertainTeed and Owens-Corning can explain a lack of price competition in the insulation market. Reserve further asserts that the cumulative effect of this alleged joint action resulted in Reserve paying more for its insulation than its main competitor-distributors. Reserve contends that Owens-Corning and CertainTeed allegedly adopted a "reactive pricing strategy ... [designed] to meet, but not beat, competition." (Reserve Response, p. 2.) Parallel business behavior, or "conscious parallelism," is circumstantial evidence which a court may rely upon to infer collusion. *Weit v. Continental Illinois Nat'l Bank & Trust Co.*, 641 F.2d 457, 462 (7th Cir.1981) (citation omitted), *cert. denied* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982). "However, when defendants come forward with denials sufficient to shift the burden under Rule 56(e), plaintiffs must come forward with some significant probative evidence which suggests that conscious parallelism is the result of an unlawful agreement." *Id.* (citation omitted). Thus, the court examines the parties' evidence in light of these standards.

### 1. Communications Among Insulation Manufacturers

▆ Reserve asserts that fiberglass insulation manufacturers exchanged pricing information through direct communication as well as advance price announcements. Reserve offers evidence of a communication between a Johns-Manville employee and an Owens-Corning employee indicating that Johns-Manville intended to restrict output. The record demonstrates, however, that the discussion, which occurred at an industry trade meeting, related to neither pricing nor to a restriction of output by either company. The Johns-Manville representative only stated that he "anticipate[d] very little increase" in "total industry capacity." (Zinn Deposition, pp. 13–14.) Furthermore, the Owens-Corning employee testified that he did not comment about Owens-Corning's intentions concerning output. *Id.* The communication "may

fairly be described as chit-chat among industry acquaintances in the field." *American Floral Services, Inc. v. Florists' Transworld Delivery Assoc.*, 633 F.Supp. 201, 214 (N.D.Ill.1986). Moreover, evidence of meetings alone is insufficient to permit a jury to infer an illegal agreement. *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir.1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). The only other evidence of direct contact among insulation manufacturers involved a CertainTeed salesperson who, on two occasions, contacted a counterpart at Johns–Manville to verify the accuracy of quotes that a customer requested that Certain-Teed meet. Reserve, however, does not rebut CertainTeed's testimony that the salesperson in question had no pricing authority and acted contrary to instructions not to discuss prices with competitors. The communications at issue are similar to those in *Weit*, 641 F.2d at 464–65, where the Seventh Circuit affirmed summary judgment in favor of five banks accused of conspiring to fix interest rates. There, like here, the defendants met the plaintiff's allegations with sworn denials, and the plaintiffs could point to only two instances where the defendants discussed interest rates. The court found that the two statements, "even when coupled with rate parallelism and an opportunity to conspire," did not constitute "significant probative evidence." *Id.* (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

Reserve alleges that insulation manufacturers signalled pricing intentions to each other through advance price announcements and price lists. Reserve argues that price lists are obsolete, as no fiberglass insulation buyer pays list price and therefore, their use is probative of collusion. The Supreme Court has held, however, that "the dissemination of price information is not itself a per se violation of the Sherman Act." *United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975). Price announcements might be impermissible if they were exchanged privately between manufacturers, or were the product of a prior agreement. *See United States v. General Motors Corp.*, 1974–2 Trade Cas. (CCH) para. 75,253, at 97,671, 1974 WL 926 (E.D.Mich.1974) (even a public pricing announcement "cannot be twisted into an invitation or signal to conspire"). Here, Owens–Corning and CertainTeed communicated their price lists and announcements directly to their customers. Furthermore, even though insulation manufacturers offered predictable, across-the-board, discounts off list price to all customers, manufacturers also offered discounts on a customer-by-customer basis in attempts to meet lower competitive offers. Reserve offers no proof that individual customer pricing was parallel, or that the defendants published price lists because of a prior agreement. Therefore, the Court considers Reserve's evidence as to the manufacturers' communications to be inadequate to establish joint action.

2. Other Circumstantial Evidence

Reserve, though, broadly contends that collusion in the fiberglass insulation industry is plausible. But "the mere opportunity to conspire, even in the context of parallel business conduct, is not necessarily probative evidence." *Weit*, 641 F.2d at 462 (citation omitted). Therefore, Reserve attempts, as it must, to demonstrate that "the defendant[s] acted in such a way that, but for a hypothesis of joint action, would not be in … [their] own self-interest." *Illinois Corporate Travel, Inc. v. American Airlines, Inc.*, 806 F.2d 722, 726 (7th Cir.1986). Reserve offers four items of circumstantial evidence to raise a genuine issue of material fact that Owens–Corning and CertainTeed acted contrary to their self-interest.

First, Reserve alleges that, in a period of depressed sales and excess capacity, the defendants increased prices instead of decreasing them to attract sales. Reserve argues that this conduct "defeats the laws of economics and is probative of collusion." (Reserve Response, p. 10) The defendants' unrebutted evidence, however, demonstrates that increasing costs played a significant role in their price increases. (Ow-

ens–Corning 12(e) Stmt., ¶ 20–22; CertainTeed 12(e) Stmt., ¶ 9–51) Moreover, the demand for fiberglass building insulation is largely driven by housing starts and is accordingly inelastic, as Reserve acknowledges in its response. (Reserve Response, p. 10) A drop in insulation prices does not necessarily expand demand. Also, Owens–Corning argues that lowering prices only makes sense if price decreases result in additional sales revenue, greater than the loss in revenue resulting from lower prices. Like customers in other highly concentrated industries, buyers of fiberglass insulation promptly report price reductions by one manufacturer to other manufacturers, requesting that the price be met. *See e.g. E.I. Du Pont De Nemours & Co. v. Federal Trade Commission*, 729 F.2d 128, 134 (2d Cir.1984) (immediate communication by "large, sophisticated and aggressive buyers" when one of only three gasoline additive producers changed price). The evidence submitted by the parties demonstrates that Owens–Corning, CertainTeed, and other competing manufacturers immediately match prices to prevent losses in market share. Considering the structure of the insulation market, then, the defendants' actions during the period of excess capacity were at least as consistent with acting in their own self-interest as acting against it. Furthermore, it is doubtful that CertainTeed actually reduced capacity during the period in question. CertainTeed's affirmative testimony that it increased capacity from 1979 to 1982, suggests otherwise. Essentially, Reserve offers only speculation to controvert CertainTeed's evidence.

Secondly, citing *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), Reserve argues that the existence of supracompetitive profit margins in the fiberglass building insulation industry is probative of collusion. If one first assumes the existence of independent, direct or circumstantial evidence of joint action, Reserve's point might have merit. With nothing more, however, Reserve's allegations suffer from a lack of meaningful analysis in terms of the efficiency of the competitors, the riskiness of the business, or whether producers reaped profits "during a period of declining costs...." *Estate of Le Baron v. Rohm & Haas Co.*, 441 F.2d 575, 578 (9th Cir.1971); R. Posner, Antitrust Law, 69 ("high rates may be due to superior efficiency rather than to collusion"); *see also United States v. Chas. Pfizer & Co.*, 367 F.Supp. 91, 101, n. 14 (S.D.N.Y.1973) ("This court is not convinced that excess profits demonstrate guilt any more than nominal profits would prove innocence of a price-fixing charge").

■ Thirdly, Reserve claims that Owens–Corning, CertainTeed, and Johns–Manville engaged in economic price discrimination, selling products at different prices to different customers, even though there was no difference in the cost of sales. Reserve asserts that this discrimination would not occur in a competitive market. Reserve, however, offers no evidence to support its generalized claim of "[p]ersistent, industry-wide price discrimination." *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 443, 103 S.Ct. 1282, 1293, 75 L.Ed.2d 174 (1983). Contrary to Reserve's assumption, collusion can just as likely be shown by the absence of price discrimination. H. Hovenkamp, Economics & Federal Antitrust Law, p. 340 (1985) ("sporadic price discrimination is generally consistent with competition on the merits, and inconsistent with cartelization"). Pricing differences between customers, then, can merely represent legitimate individualized responses to changes in competition.

Finally, Reserve suggests that the entry of new competitors such as Knauf and Guardian into the insulation market during a period of excess capacity indicates collusion. Reserve postulates that perceived opportunities for unusual profits will attract new entrants. *See* R. Posner, Antitrust Law, *supra* at 68. As Owens–Corning points out, however, new entrants may just have likely entered into the insulation market in anticipation of increased housing starts. Moreover, the source which Reserve relies upon also lists the existence of a fringe of small sellers as a factor limiting the likelihood of collusion. *Id.* at 56. The

court must conclude that Reserve's allegations amount only to conjecture. Therefore, considering the lack of probative evidence offered to rebut defendants' characterization of the fiberglass insulation industry as an oligopolistic, yet competitive, market, "[p]arallel behavior and the hope that something further can be developed at trial is not sufficient to warrant a trial on the merits." *Weit,* 641 F.2d at 462. In this case, any price uniformity is at least as consistent with competition as with collusive behavior. *E.I. Du Pont De Nemours & Co.,* 729 F.2d at 139, 141 (The F.T.C. conceded that "price uniformity is normal in a market with few sellers and homogeneous products...."). The Court accordingly grants Owens–Corning's and Certain-Teed's motion for summary judgment as to Count I. The defendants are also entitled to summary judgment on Count III, Reserve's pendent state law claim, which is also premised on the existence of a conspiracy sufficient to establish a violation of the Illinois Consumer Fraud and Business Practices Act. Ill.Rev.Stat. (1984) ch. 121½, ¶ 261 *et seq.* (Reserve Response, p. 1, n. 1).

### C. *Count II Robinson–Patman Act Violation*

■ Owens–Corning's motion for summary judgment as to Reserve's Robinson-Patman claim is based on Owens–Corning's defense that any price discrimination resulted from Owens–Corning's good faith efforts to meet competition. For the purposes of this motion, Owens–Corning concedes the existence of price discrimination to all but two of the eleven competitors which Reserve identifies. These two entities are Owens–Corning Supply Division ("Supply") and Owens–Corning itself, to whom Reserve alleges it lost sales between 1979 and 1984. As a matter of law, however, sales lost to Owens–Corning and Supply do not fall within the meaning of section 2(a). Supply is an unincorporated division of Owens–Corning. Intra-company transfers cannot be considered sales to favored competitors. *See Emil J. Lauter Co. v. Brunswick Corp.,* 532 F.Supp. 983, 984–85 (N.D.Ill.1982) (defendant could not sell to

itself, even if it maintained divisional accounting record for it own convenience); *see also O'Byrne v. Cheker Oil Co.,* 727 F.2d 159, 165 (7th Cir.1984).

■ Owens–Corning may rebut a *prima facie* case of price discrimination as to the remaining nine Reserve competitors, if it can show that its "lower price ... was made in good faith to meet an equally low price of a competitor...." 15 U.S.C. § 13(b). A seller, having the burden of proof on this issue, " 'must show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor.' " *United States v. United States Gypsum Co.,* 438 U.S. 422, 451, 98 S.Ct. 2864, 2881, 57 L.Ed.2d 854 (1978) (*quoting Federal Trade Commission v. A.E. Staley Mfg. Co.,* 324 U.S. 746, 759–60, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945)). Each inquiry into a section 2(b) good faith defense is "fact-specific." *United States Gypsum Co.,* 438 U.S. at 455, 98 S.Ct. at 2882. Owens–Corning's section 2(b) defense has two parts. First, Owens–Corning argues that it offered increased discounts to insulation distributor Builder Marts of America ("BMA") in good faith to meet a competitor's equally low or lower price. Second, Owens–Corning asserts that it granted discounts to the remaining eight purchasers pursuant to reporting procedures designed to ensure that Owens–Corning would meet, but not beat, competitors' prices.

#### 1. Owens–Corning's Discount to BMA

The gravamen of Reserve's Robinson-Patman claim relates to Owens–Corning's relationship with BMA, a distributor competing with Reserve. In April of 1979, Owens–Corning granted BMA a confidential discount of 13% to meet a reported price from Johns–Manville. On April 6 or April 7, 1979, Bill Lee, Vice President of BMA, spoke with Charles Hartmann, manager of Owens–Corning's Residential Insulation Distribution Marketing Division ("RIDMD"). In this conversation, during which Hartmann took contemporaneous notes, Lee told Hartmann that CertainTeed

offered BMA a discount of 16% on all products, plus an additional percentage discount on two other products. Lee further informed Hartmann that Owens–Corning would lose business at BMA unless Owens–Corning met CertainTeed's discount. On April 16, 1979, Owens–Corning approved a request to continue BMA's 13% discount. On May 25, 1979, Hartmann partially met CertainTeed's reported offer by increasing BMA's discount to 15%, retroactive to May 1, 1979. On June 20, 1979, Owens–Corning increased BMA's discount to 16%. About July 1, 1980, Lee told Hartmann that Owens–Corning's price was still higher than CertainTeed's and unless Owens–Corning lowered its prices, BMA would purchase a greater share of insulation from CertainTeed. On August 5, 1980, Owens–Corning gave BMA an additional discount of $150.00 per truckload of merchandise. Owens–Corning contends that these facts support summary judgment in its favor. Reserve, however, argues that the record establishes that Owens–Corning had no basis to offer increased discounts to BMA.

The Supreme Court established five factors that are probative of a seller's good faith: (1) evidence that a seller had received reports of similar discounts from other customers; (2) evidence that a seller was threatened with a termination of purchases if the discounts were not met; (3) documentary evidence; (4) an appraisal of the reasonableness of a reported discount in terms of available market data; and (5) the seller's past experience with the buyer. *United States Gypsum*, 438 U.S. at 455, 98 S.Ct. at 2882. Good faith, however, is a flexible concept and accordingly, is "fact specific." *Id.* at 454–55, 98 S.Ct. at 2882–83. The facts support the proposition that BMA threatened a termination of purchases if Owens–Corning did not lower its prices. In April of 1979, Lee of BMA telephoned Hartmann, telling Hartmann that Owens–Corning would lose business unless Owens–Corning met CertainTeed's reported discounts to BMA. Lee repeated this tactic on July 1, 1980, informing Owens–Corning that its prices were still higher than CertainTeed's, and that BMA would purchase a greater share of products from

CertainTeed unless Owens–Corning again lowered its prices. Reserve attempts to cast doubt on the existence of any threatened terminations by citing various assurances made by BMA to Owens–Corning that Owens–Corning would not lose business to CertainTeed. Reserve's objections are not persuasive, however, because BMA's assurances came after, not before, Owens–Corning increased its discount from 13% to 16%.

Moreover, the record shows that Owens–Corning appraised the reasonableness of CertainTeed's reported price in terms of available market data. Owens–Corning concedes that it did not conform to its "Special Approved Report" (*infra*, p. 17) procedure, which Owens–Corning usually requires of its sales representatives to document the specifics of a competitive discount. Citing *United States Gypsum*, Reserve asserts Owens–Corning's failure to document its efforts as evidence of its bad faith. Reserve, however, ignores *United States Gypsum's* language. The Court called for "[e]fforts to corroborate the reported discount by seeking documentary evidence *or* by appraising its reasonableness in terms of available market data...." 438 U.S. at 455, 98 S.Ct. at 2882 (emphasis supplied). Hartmann of Owens–Corning attested that it was his routine and practice to evaluate prices in light of recently reported competitive discounts and satisfy himself that the reported discount existed and that Owens–Corning's offer was no more than necessary to either retain, or obtain, business.

Reserve objects, however, that Owens–Corning's and CertainTeed's discount of 16% to BMA established a new national low, and that Owens–Corning was the first to sell at this new low when its 16% discount became effective on August 1, 1979. That does not, however, impeach Owens–Corning's defense "[s]ince good faith, rather than absolute certainty, is the touchstone of the meeting-competition defense, a seller can assert the defense even if it has unknowingly made a bid that in fact not only met but beat his competition." *Great Atlantic & Pacific Tea Co. v. Federal*

*Trade Commission,* 440 U.S. 69, 83, 99 S.Ct. 925, 934, 59 L.Ed.2d 153 (1979). Reserve also asserts that Owens–Corning acted in bad faith by offering BMA a discount of 16%, when Owens–Corning knew that it could compete with CertainTeed at 15%. Reserve points out that at first Owens–Corning only partially met CertainTeed's reported offer, before increasing it to 16%, 26 days later, without further negotiations. Reserve compares this discount in response to CertainTeed's discount, to earlier in 1979, when Owens–Corning granted BMA only a discount of 13% in response to a reported 16% discount from competitor Johns–Manville.

Manufacturers react to different competitors in different ways. Hartmann testified that he did not believe that Owens–Corning's business with BMA was assured. Hartmann was aware that CertainTeed attempted to sell BMA insulation at various times during the 1970's. Owens–Corning was also aware that BMA expressed dissatisfaction with the amount of insulation allocated to it during a period of restricted production in 1977–78. Furthermore, Owens–Corning believed that BMA covered its needs during this period with purchases from CertainTeed, and that BMA was considering an additional source of supply to protect itself. (Hartmann Affidavit, ¶ 36.) In fact, Hartmann received no assurances from BMA that it would not further shift purchases until after Owens–Corning increased BMA's discount to 16%. Therefore, in light of Owens–Corning's experience with BMA, Owens–Corning's appraisal of and response to BMA's threat of termination of purchases was reasonable. Hartmann, who dealt personally with Lee since 1976, attested to Lee's trustworthiness and the respect Lee enjoyed within the industry. Moreover, BMA was a long-term customer of Owens–Corning with 1978 purchases exceeding $9,000,000. Owens–Corning did not casually rely upon "uncorroborated reports." *United States Gypsum,* 438 U.S. at 453, 98 S.Ct. at 2881. Rather, "the source of information was a person whose reliability was not questioned and who had personal knowledge of the competing bid." *Great Atlantic & Pacific Tea Co.,* 440 U.S. at 84, 99 S.Ct. at 935.

In a last effort, Reserve argues in a conclusory fashion that Owens–Corning knew or should have known that CertainTeed's price to BMA was illegal, and that Owens–Corning could not in good faith meet an illegal price. This argument is identical to the one summarily rejected by Judge Duff with regard to CertainTeed's motion for summary judgment as to this count. *Reserve Supply Corporation,* 639 F.Supp. at 1467. The record demonstrates that Owens–Corning had a legitimate basis for its good faith belief. Price disparities may exist for lawful reasons. *See* 15 U.S.C. § 13(a). Reserve simply fails to present any evidence which creates a genuine issue of material fact with respect to BMA.

### 2. Owens–Corning's Competitive Pricing Procedure

■ Owens–Corning's regular practice required its sales representatives to complete "Special Approved Requests" ("SAR's") when deciding whether to partially or wholly meet a reported competitive offer. SAR's document information about the identities of customers and competitors, competitive prices reported by a customer, and prices requested for approval by Owens–Corning sales representatives. If a sales representative recommended meeting a price, the representative forwarded a completed SAR to Owens–Corning's Toledo headquarters, where RIDMD personnel could assess the reported competitive offer's credibility. If necessary, RIDMD sought further information from a customer. Owens–Corning asserts that RIDMD only met competitive offers to the extent necessary to retain or to secure business. Furthermore, Owens–Corning periodically reverified that competitors continued to offer the prices that Owens–Corning had elected to meet. Owens–Corning argues that its SAR procedure was therefore sufficient to comply with section 2(b) requirements as to the remaining eight competing distributors. The remaining eight distributors are ACE, American Hardware, Central B, Chatham Supply, Cotter, Hardware

Wholesalers, Inc. ("HWI"), Rou Products, and Rounds & Porter.[2]

 Reserve contends that, on the whole, Owens–Corning's SAR procedures are inadequate to raise a section 2(b) "meeting competition" defense. Reserve again argues that Owens–Corning should have requested documentation to further confirm reported competitive offers. As the court noted earlier, however, a purported lack of documentation, without more, will not necessarily destroy a good faith defense. Owens–Corning's SAR procedure is almost identical to CertainTeed's "Reports of Competition" system, which Judge Duff found sufficient to establish a good faith defense that discounts were offered to meet, but not beat, competition. *Reserve Supply*, 639 F.Supp. at 1465; *see also William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1046–47 (9th Cir.1981). Owens–Corning's procedures are no less sufficient.

Reserve attempts to rebut the sufficiency of the SAR process with respect to two specific accounts. First, Reserve generally alleges that Owens–Corning beat competition for Rounds & Porter purchases. Reserve does not challenge Owens–Corning testimony establishing that Owens–Corning believed that it only met, and did not beat, that competitor's reported price. (Ritchie Deposition, p. 81.) Pointing to a rejected SAR regarding a reported competitive offer to HWI, Reserve also contends that Owens–Corning knew that HWI reported inaccurate information. The evidence demonstrates, however, that Owens–Corning automatically rejected this SAR because it lacked required information, not because it contained false information. (Ritchie Deposition, pp. 200–02.) In addition, Reserve asserts that Owens–Corning labeled one HWI source of information as a "questionable source." This HWI employee allegedly reported to Owens–Corning that Johns–Manville lost money on its insulation operations in 1981. This reference, at best, however, is ambiguous. The label could just as easily suggest that the HWI employee was

a questionable source of information regarding Johns–Manville's profitability, but not Johns–Manville's pricing, which a HWI employee would have more opportunity to know. One ambiguous reference cannot destroy the sufficiency of the entire SAR process.

A successful "meeting competition" defense exonerates a seller from Robinson–Patman liability. *Falls City*, 460 U.S. at 438, 103 S.Ct. at 1290. The record establishes that no genuine issue of material fact exists as to Owens–Corning's good faith belief that it met, but did not beat, competition. Therefore, the Court grants Owens–Corning's motion for summary judgment on Count II.

### CONCLUSION

The court grants CertainTeed's and Owens–Corning's motion for summary judgment as to Counts I and III. The court also grants Owens–Corning's motion for summary judgment as to Count II.

---

2. Reserve also claims that Owens–Corning initiated lower prices to Wickes and 84 Lumber.

Reserve, however, does not claim any injury from these transactions.