Greta S. WALKER, d/b/a/ Greta's Hallmark Shop, Plaintiff,

v.

HALLMARK CARDS, INC., Hallmark Marketing Corp., Ron Ratkey, and Walgreen Co., Defendants.

No. 94–23–CIV–FTM–25D.

United States District Court, M.D. Florida, Fort Myers Division.

June 6, 1997.

Ann T. Frank, Ann T. Frank, P.A., Naples, FL, for Plaintiff.

Robert C. Shearman, Henderson, Franklin, Starnes & Holt, P.A., Ft. Myers, FL, Barry M. Katz, Hallmark, Inc., Kansas City, MO, John M. Townsend, Robert B. Funkhouser, Hughes, Hubbard & Reed, Washington, DC, for Defendants.

### ORDER

ADAMS, District Judge.

**THIS CAUSE** is before the Court upon: Defendants', Hallmark Cards, Inc., Hallmark Marketing Corp., and Ron Ratkey ("Hallmark Defendants," "Hallmark," or "Defendants"), Motion for Partial Summary Judgment ("Motion") (Dkt.# 57); Defendant Walgreen Co.'s ("Walgreen") Motion for Summary Judgment (Dkt.# 81); and the Parties' Joint Motion for Stay of Deadlines Pending Disposition of Summary Judgment Motions (Dkt.# 87).

Pursuant to the Parties' representations contained in the Joint Motion that the Parties had resolved their differences as to Counts II, III, and IV of the Second Amended Complaint and as to the counterclaim, the portion of the Hallmark Defendants' Motion dealing with Count II (Tortious Interference with Business Contract) is deemed withdrawn and this Order will solely focus on Counts I & V (Robinson–Patman Act) of the Second Amended Complaint.

Having reviewed the entire File, including depositions, affidavits, and memoranda of law in support of and in opposition to the motions, the Court makes the following findings of fact and conclusions of law:

## I. Relevant Facts and Procedural Background

The Plaintiff, Greta S. Walker, filed suit against the Hallmark Defendants, and later joined Defendant Walgreen. The Second Amended Complaint contains the following causes of action: Count I– Robinson–Patman Act ("RPA"), 15 U.S.C. Section 1, as to the Hallmark Defendants; Count II– Tortious Interference with Business Contract; Count III– Fraudulent Misrepresentation; Count IV– Sherman and Clayton Act Violations; Count V– RPA Violations, as to Walgreen. Specifically, from 1986 to 1993 the Plaintiff owned and operated Greta's Hallmark Shop ("Shop"), located in the Pavilion Shopping Center ("Pavilion") in Naples, Florida. The Plaintiff purchased the Shop from its previous owners in March of 1986 and entered into a new $60,000.00 note and security agreement with Hallmark to assume the previous owners' debt to Defendant Hallmark for certain display fixtures. Additionally, the Plaintiff was extended credit and purchasing authority for other Hallmark merchandise. Much of Plaintiff's negotiations with Defendant was accomplished with Ron Ratkey, Defendant Hallmark Marketing's Sales Manager for the southern district of Florida from 1991 until very recently.

In and around 1991, a Walgreen store, also located at the Pavilion, began selling Hallmark products.

The Plaintiff complains that she was the victim of price discrimination occasioned by the Hallmark Defendants' relationship with the Walgreen store at the Pavilion. Specifically, she alleges that Hallmark gave Walgreen more favorable terms by allowing Walgreen free fixtures, free seasonal returns, 10% credit toward purchases, and other incentives. She claims that these disparities in terms resulted in competitive injury to her business. On a broader scale, the Plaintiff alleges a lessening of competition or competitive injury among independent Hallmark card shops in the southwest region of Florida, which correlates to Hallmark's discriminatory pricing with an increasing number of Walgreen rooftops.

In turn, Hallmark maintains that the Plaintiff has failed to show an antitrust injury, causation, or damages. Hallmark also argues that the Plaintiff was a victim of increased competition, not a lessening of competition. Further, Hallmark raises the "meeting the competition" defense of the RPA. Employing this defense, Hallmark argues that it is in national competition for Walgreen business with American Greeting Cards, which gives terms to Walgreen stores comparable to those given by Hallmark to the Walgreen at the Pavilion.

In addition to adopting many of Hallmark's arguments, Defendant Walgreen moves for summary judgment on Count V of the Second Amended Complaint on the grounds that it did not knowingly receive discriminatory pricing.

## II. Summary Judgment Standards

The grant of summary judgment is only proper if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56. The moving party satisfies its burden by showing an absence of evidence to support an essential element of the nonmoving party's case. *Id.* Once a party properly makes a motion for summary judgment by demonstrating to the district court the absence of a genuine material fact, whether or not accompanied by affidavits or other proof, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)); *Hoffman v. Allied Corp.,* 912 F.2d 1379, 1382 (11th Cir.1990).

The standard for summary judgment mirrors that of directed verdict. *Hoffman,* 912 F.2d at 1383. Thus, a dispute about a material fact is genuine, and summary judgment is inappropriate, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Further, the Court must examine the evidence in light of the relevant substantive law when identifying which facts are material. *Id.* Of course, as a federal antitrust matter, persuasive federal substantive law will govern this Court's determination of this Motion.

The Court must view all evidence most favorably toward the Plaintiff, as the nonmoving party, and all justifiable inferences are to be drawn in the Plaintiff's favor. *Hoffman,* 912 F.2d at 1383. If the Court finds, under the relevant standards, that reasonable jurors could find a verdict for the nonmoving party since a disputed factual issue exists, summary judgment should be denied. *Id.* The Court may not decide a factual dispute. *Fernandez v. Bankers National Life Ins. Co.,* 906 F.2d 559, 564 (11th Cir. 1990). If a factual issue is present, the Court must deny summary judgment and proceed to trial. *Id.*

## III. Discussion

### a. Discriminatory Pricing, Competitive Injury, and Causation

Relying on *Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 556, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990), inter alia, Hallmark maintains that the Plaintiff has failed to establish the requisite elements of "injury to competition" and "causation," i.e. that the injury complained of is causally connected to the alleged discriminatory pricing. Additionally, citing 15 U.S.C. Section 15(a) and *Texaco,* 496 U.S. at 556, Hallmark argues that the Plaintiff cannot show that the injury was 1) the result of decreased, rather than increased, competition, and 2) the sort of injury meant to be avoided by the antitrust laws. The Plaintiff counters that competitive injury is not a necessary element of a prima facie case of price discrimination. Rather, once discrimination is shown, the burden shifts to the Defendants

to prove that its acts did not substantially injure or lessen competition. *O'Connell v. Citrus Bowl, Inc.,* 99 F.R.D. 117 (E.D.N.Y. 1983).

■ However, the Plaintiff's recitation of the law is procedurally inaccurate. In the Eleventh Circuit, to establish a price discrimination claim under the RPA, a plaintiff must show: 1) that the defendant discriminated in price, discounts, or services between purchasers of commodities of like grade and quality in the course of interstate commerce; 2) that the price discrimination resulted in the requisite injury to competition or competitors; and 3) at least the approximate amount of damages. *Chrysler Credit Corp. v. J. Truett Payne Co. Inc.,* 670 F.2d 575, 578 (5th Cir.1982), *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982), citing *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 852 (5th Cir.1981).[1]

Price discrimination is not *per se* violative of the RPA, *Foremost Dairies, Inc. v. F.T.C.,* 348 F.2d 674, 679 (5th Cir.1965). The Eleventh Circuit requires that a plaintiff demonstrate "some sort of real competitive injury," *DeLong Equipment Co. v. Washington Mills Electro Minerals Corp.,* 990 F.2d 1186, 1202 (11th Cir.1993), and, moreover, that the injury is causally connected to the alleged antitrust violation. *Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414, 1426–27 ("injury [must be] caused by an improper effect 'flowing' from the defendant's antitrust violation."). In other words:

> The causation question is a little more involved. It asks for something other than an inquiry into whether an antitrust violation has put a plaintiff in a worse position than it otherwise would have been in... The causation question asks not whether the antitrust violation caused the plaintiff's injury, but whether the banned effects flowing from that violation-as opposed to the beneficial ones- led to Plaintiff's harm... A competitor cannot complain if injured unless the injury flows from anticompetitive, not anti-competitor, effects... [i]n the final form the RPA causation ques-

---

**1.** The Eleventh Circuit is bound by the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981)(en banc).

tion asks whether some or all of the plaintiff's injury was derived from or materially furthered by a competitive advantage bestowed upon a favored purchaser through its receipt of discriminatory prices... [Proof of causation must be established] 'as a matter of fact and with a fair degree of certainty.'

*Minolta,* 903 F.2d at 1427–28.

Here, the record on file is undisputed[2] that Hallmark gave more favorable terms to the Walgreen store located at the Pavilion than it had to Plaintiff. These terms concerned comparable transactions. For instance, while the Plaintiff was liable for $60,000.00 worth of Hallmark fixtures and did not receive certain credits, Hallmark gave Walgreen free fixtures, a 10% credit toward purchasing costs of cards and merchandise, and free seasonal returns on merchandise, among other incentives. *Minolta,* 903 F.2d at 1426. Thus for the purposes of this analysis, Walgreen is considered a favored customer or competitor and Greta's Hallmark Shop is considered the disfavored customer or competitor.

 The Plaintiff argues that the alleged decline in sales and ultimate demise of Greta's Hallmark Shop, all of which she asserts occurred after Walgreen began selling Hallmark products at the Pavilion location, is a prima facie showing of the requisite "lessening of competition" or "competitive injury." The Court does not agree. As explained above, the Plaintiff's burden is to establish that "but for" Hallmark's preferred treatment of the Pavilion Walgreen, the demise of Greta's Hallmark Shop would not have occurred. *Minolta,* 903 F.2d at 1427. In fact, the record evidence is to the contrary.

First, Hallmark's offer of the Mathuerin Memo (GHS0004), tends to dispute the Plaintiff's bare contention that its sales decreased only after the introduction of Hallmark merchandise at Walgreen. Second, Plaintiff has presented no "matter of fact" evidence that Hallmark's favoritism with Walgreen had any nexus to the declining sales or the Shop going out of business. Indeed, Plaintiff's deposition testimony indicates that the discrimination had no effect. Therein she answered "no" to the question: "[w]ould it have had any effect on your store, in your opinion, if Hallmark had sold Hallmark product to Walgreen's without giving it seasonal returns and loaned fixtures?" *See* Greta S. Walker Deposition, at page 100, lines 16 through 19. Plaintiff's continuation of her answer underscores Plaintiff's misconception of the RPA, "[w]ell it made it easier for them to make profit, but, no, *they should have never been able to sell Hallmark in my same center."* *Id.,* at lines 19 through 20 (emphasis added). Further, suggesting that increased, rather than decreased, competition resulted in the Shop's closure, the Plaintiff additionally testified that "[i]t was the customer's perception that we were fighting... Walgreen's was known for lower prices... [end-line customers] assume that they would get [Hallmark merchandise] lower at Walgreen's." *Id.,* page 127, at lines 12 through 20. Despite the foregoing, Plaintiff is nevertheless unable to articulate how the discriminatory incentives to Walgreen caused or materially furthered the decline in sales or the end of Greta's Hallmark Shop.[3] Rather the evidence at bar indicates that even the Plaintiff believes that the incentives made no difference to the al-

---

**2.** The Defendants declined to address the threshold issue of price or term discrimination in their Motion, focusing instead on the issues of antitrust injury and economic necessity affirmative defenses.

**3.** Similar to the Plaintiff's proposition at bar, the plaintiff in *J. Truett Payne Co., Inc., v. Chrysler Motors Corp.,* 451 U.S. 557, 564 n. 4, 101 S.Ct. 1923, 1928 n. 4, 68 L.Ed.2d 442 (1981) argued that RPA causation was present because, as a disfavored purchaser it was required pay more for its goods than its competitors and, therefore, it was less able to compete, as it had fewer funds available with which to advertise and make capi-

tal expenditures. This liberal reading of the causation requirement of the RPA was rejected by the Supreme Court. The Supreme Court concluded that a jury should not be permitted to simply infer "the requisite injury and damage from a showing of substantial price discrimination." *Id.,* at 561, 101 S.Ct. at 1927. On remand, the Fifth Circuit found the plaintiff's evidence of competitive injury was insufficient as a matter of law for a finding of unlawful price discrimination under the RPA. *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.,* 670 F.2d at 581 ("[t]he speculative and unsupported testimony in this case was legally insufficient... ").

leged competitive injury and that the Shop was doomed when Walgreen began selling Hallmark merchandise at the Pavilion. Accordingly, no causation between the discrimination and alleged injury has been shown.

### b. Section 2(b) Meeting Competition Defense

Even were the Plaintiff successful in presenting a prima facie case of illegal price discrimination, the Defendants have offered unrebutted evidence of its good faith attempt to meet the competition.

Via the Defendants' detailed Affidavits, Hallmark relies on the "meeting competition" defense found at Section 2(b) of the Clayton Act, as amended by the RPA, to defeat Plaintiff's claims of illegal price discrimination. The "meeting competition" defense of the RPA, allows a seller to "set its lower price [to a second line buyer in competition with another buyer] in good faith to meet an equally low price of [the seller's] competitor" without violating the price discrimination prohibitions of the RPA. *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 442, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983)(emphasis added). In other words, the meeting competition defense provides an economic defense to price discrimination. *Minolta*, 903 F.2d at 1419–20.

■ At the outset, as the Parties have noted, "under summary judgment involving section 2(b) a legal conclusion that the meeting competition defense has been established is rarely, if ever, reachable." *Minolta*, 903 F.2d at 1425. This is so because, without a trial, it is difficult to determine the existence of "good faith [which] lies at the core of the [competition] defense." *Id.* "The test for establishing the defense is particularly fact-bound." *Id.* Moreover, the summary judgment movant normally does not bear the burden at trial, but here Hallmark does, as the "statute places the burden of establishing the defense on the [defendant] not the [plaintiff]." *Id.* It is well-settled that in the sum-

mary judgment context, "the party against whom the burden of proof falls at trial faces a challenge more difficult than otherwise." *Id.*, citing *Celotex*, 477 U.S. at 322–23.

However, because the "meeting competition" defense involves a well-settled analysis and characteristics, the defense "make[s] application of these summary judgment criteria [Celotex] somewhat more judicially manageable than might be the case in other contexts." *Reserve Supply Corp. v. Owens–Corning Fiberglas*, 971 F.2d 37, 42 (7th Cir.1992).

Having the burden of proof, Hallmark "must show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *United States v. United States Gypsum Co.*, 438 U.S. 422, 451, 98 S.Ct. 2864, 2881, 57 L.Ed.2d 854 (1978)(cite omitted). In other words, Hallmark must show that its "lower price [or terms] was a good-faith response to a competitor's lower price [or terms]." *Falls City*, 460 U.S. at 451, 103 S.Ct. at 1297.

■ Upon review of the relevant Affidavits and attachments, the Court finds that Hallmark has met the required test of "indicia of good faith" as set forth in *United States Gypsum Co.*, 438 U.S. at 454.[4] To establish an absence of factual dispute regarding the defense, the Hallmark Defendants offer the affidavit testimony of Terry Peterson ("Peterson Affidavit") and Robert C. Shearman which supports their contention that the terms offered to the Walgreen at the Pavilion were "equal" to those offered by American, and other competitors, and were made in good faith. According to Hallmark, American is its primary competitor and the two companies have been vying for Walgreen "rooftops" for several years. During years of tracking and verifying offers to Walgreen made by American, Hallmark attempted to meet those terms. Peterson Affidavit, at paragraph 27. Hallmark received and relied on reports of the terms offered by American

---

4. 1) whether the seller has past experience with the buyer, 2) whether the seller has received reports of similar discounts in the market, 3) whether the seller had been threatened with a termination of sales if the discounts were not met, and 4) whether the seller corroborated the reported discount by seeking documentary evidence or by appraising it in the light of market data. Id., 438 U.S. at 454.

to Walgreen and other drug chains to "understand the competitive pressures" of the greeting card market. Peterson Affidavit, at paragraphs 8–10, 22, 27–28. Plaintiff also acknowledges that American is known to offer free freight and seasonal returns to its customers, and generally more favorable terms to its card shops. Walker Deposition, at p. 100; Second Amended Complaint, at paragraph 8. By 1993, American's terms included free returns on seasonal greeting cards, loaned fixtures, a growth fund, and store buildouts. Peterson Affidavit, at paragraphs 16–21.

Hallmark did not rely on "uncorroborated reports." *United Gypsum*, 438 U.S. at 453, 98 S.Ct. at 2881. Rather, "the source of information was a person whose reliability was not questioned and who had personal knowledge of the competing bid." *Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 84, 99 S.Ct. 925, 935, 59 L.Ed.2d 153 (1979). Vernon A. Brunner ("Brunner"), executive vice president of marketing for Walgreen, states:

> The terms of sale on which Hallmark provided greeting cards and other products to Walgreen from 1986 through 1993 were the result of vigorous negotiations over the course of those years, in which I represented Walgreen. Each improvement (from Walgreen point of view) in the terms provided by Hallmark during the period 1986 through 1993 was offered after I had brought to Hallmark's attention equal or better terms that were being offered to Walgreen by Hallmarks competitors, including American Greetings.

Brunner Affidavit, at paragraph 5. Additionally, it was clear to Hallmark that its relationship with Walgreen "could be in jeopardy" if Hallmark did not attempt to meet American's terms. Peterson Affidavit, at paragraph 16. By 1993, "[t]o maintain its position with Walgreen in the face of continued attempts by American to regain that business, which amounted to 85.5 million in net wholesale volume...," Hallmark offered Walgreen: 1) free seasonal returns, meeting American's offer of free seasonal returns; 2) a growth fund of ten (10) per cent on "everyday" cards, partially meeting American's offers of allowances and growth funds; 3) free Christmas displays and loaned fixtures for new and converted "rooftops," partially meeting American's policy of providing free fixtures; and 4) reimbursements for remodeling of greeting card departments, to meet American's free fixture and store conversion offers. *Id.*, at paragraph 23. At the time these terms were offered to Walgreen, as now, Peterson believed that those terms were necessary to compete with and partially meet terms offered by American. *Id.*, at paragraph 24.

Hallmark's proof of good-faith reliance is credible. Peterson's information concerning American's offers was being provided by Walgreen's fourth-highest ranking officer, Brunner. Further, that intelligence was independently verified by Peterson via various "term sheets." *See* Exhibits G & H, attached to Peterson Affidavit. Hallmark's proof therefore satisfies the standard of indicia of good faith because of Hallmark's thirteen year experience with Walgreen, its reliance on verbal and written reports of similar discounts in the market, the threatened loss of Walgreen card sales to American or Carlton, and Hallmark's verification of offered terms via the "term sheets." *United States Gypsum*, 438 U.S. at 454.

Interestingly, Plaintiff does not even contend that Hallmark's change in terms with Walgreen was illegal: "Plaintiff does not claim it was improper for Hallmark to change its terms of sale to compete for business with other card suppliers." *See* Plaintiff's Memorandum, at p. 2. However, Plaintiff does assert that the Peterson declaration is insufficient as a matter of law to establish the defense. For example, the Peterson Affidavit states that Hallmark "m[et] **in part** more advantageous terms" of American Greeting Cards. *See* Peterson Affidavit, at paragraph 24 (emphasis added). Likewise, Peterson's memorandum of December 17, 1990, regarding Walgreen, states that "[t]his term of sale will **only partially meet** competitive terms offered by American Greetings..." *See* Exhibit C, attached to Peterson Affidavit (emphasis added). According to Plaintiff, because Hallmark "partially" met American's terms, Defendants therefore con-

cede that they did not meet an "equally" low price of a competitor.

However, Hallmark need not have attempted to meet American's terms "to the last fraction of a cent." *Callaway Mills Co. v. FTC,* 362 F.2d 435, 443 n. 14 (5th Cir. 1966). This very issue was addressed by the Seventh Circuit in *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.,* 799 F.Supp. 840, *affirmed,* 971 F.2d 37 (7th Cir.1992). There, at the trial court level, Owens–Corning advanced a "meeting competition" defense by arguing that it had attempted to meet a 16% discount offered by a competitor, by initially offering the same buyer a 13% discount. Reserve argued that Owens–Corning "only partially met" the reported offer and, therefore, was not entitled to the meeting competition defense. *Id.,* at 847. However, the district court found that "[m]anufacturers react to different competitors in different ways." *Id.* As the Seventh Circuit further noted, Owens–Corning " 'was not offering any additional discounts more than necessary to retain the existing share of the business.' " *Reserve Supply,* 971 F.2d at 43 (cite omitted). The Seventh Circuit affirmed the district court's grant of summary judgment for Owens–Corning, upon the good-faith defense of meeting competition. *Id.,* at 46.

The same rationale applies here. From the record evidence, noted above, Hallmark's change in terms with Walgreen was in direct response to terms offered Walgreen by American and others, and was an attempt to maintain and/or increase its share. Though Hallmark's terms were not "identical" to the American offers, it is evident that the terms were "equal," involving the same sort of discounts and incentives, and were offered in a good faith response to its competitors' terms. Accordingly, the Court finds the good faith defense available to the Hallmark Defendants.

### c. Section 3 of the RPA

The Hallmark Defendants correctly urge that section 3 of the RPA is a criminal provision, codified in 15 U.S.C. Section 13a. Plaintiff did not address the issue in her opposition memorandum. As such, the portions of paragraph 12 of the Second Amended Complaint, concerning 15 U.S.C. Section 13a, are stricken from the record and damages claims exclusively arising therefrom are dismissed with prejudice. *Nashville Milk Co. v. Carnation,* 355 U.S. 373, 382, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958)("a private cause of action does not lie for practices forbidden *only* by section 3 of the Robinson–Patman Act.")(emphasis added).

### d. Walgreen's Motion for Summary Judgment

■ In addition to relying on the arguments set forth by the Hallmark Defendants, Walgreen asserts that it is entitled to judgment as a matter of law because, among other things, Plaintiff has failed to establish Walgreen's requisite knowledge under 15 U.S.C. Section 13(f).

Here, the record is barren of any evidence upon which a reasonable jury could conclude that Walgreen knew, or should have known, that its competitors, e.g., other sellers of Hallmark merchandise, were not receiving free fixtures, free returns, credits, and other incentives. Indeed, correspondence between Walgreen and Hallmark, dating from 1986, shows that their business relationship could be jeopardized unless the above-described terms were adjusted by Hallmark, because of other offers from Hallmark's competitors.

Moreover, because the Court has found that Hallmark's terms to Walgreen were offered in good faith to meet competition of its competitors, Walgreen is entitled to judgment as a matter of law. *Pacific Tea Co.,* 440 U.S. at 76 ("[u]nder the plain meaning of [section] 2(f), therefore, a buyer cannot be liable if... the seller has an affirmative defense... [because] there is no price discrimination 'prohibited by this section.' ") *quoting,* 15 U.S.C. Section 13(f).

### IV. Conclusion

Based upon the foregoing, it is hereby **ORDERED and ADJUDGED:**

1.) The Hallmark Defendants' Motion for Partial Summary Judgment (Dkt.# 57) is **GRANTED.**

2.) Walgreen's Motion for Summary Judgment (Dkt.# 85) is **GRANTED**.

3.) The Parties' Joint Motion for Stay of Deadlines Pending Disposition of Summary Judgment Motions (Dkt.# 87) is **DENIED AS MOOT.**

4.) Judgment is hereby entered in favor of Defendants and against Plaintiff.

Plaintiff shall take nothing from this action and go hence without day.