**HOOVER COLOR CORPORATION,**
Plaintiff,

v.

**BAYER CORPORATION, Defendant.**

No. Civ.A. 98–0841–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

July 30, 1998.

Dennis P. Brumberg, Richard H. Wall, Brumberg, Mackey & Wall, P.L.C., Roanoke, VA, Margaret K. Garber, Brumberg, Mackey & Wall, P.L.C., Roanoke, VA, for Hoover Color Corporation, plaintiff.

Michael F. Urbanski, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, William B. Poff, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, Thomas Demitrack, Mary E. Sweeney, Susanne H. Deegan, Jones, Day, Reavis & Pogue, Cleveland, OH, for Bayer Corporation, defendant.

## MEMORANDUM OPINION

KISER, Senior District Judge.

This case involves a claim of price discrimination in violation of the Clayton Act, ch. 323, § 2, 38 Stat. 730 (1914), as amended by the Robinson–Patman Act, ch. 592, § 1, 49 Stat. 1526 (1936) (codified as amended at 15 U.S.C.A. § 13(a)). Before me now is defendant's motion for summary judgment. The parties have fully briefed the issues involved, and have presented oral argument. The motion is, therefore, ripe for disposition. For the reasons contained herein, defendant's motion for summary judgment is GRANTED.

1. This case primarily concerns the construction products and coatings segments. Rockwood was recognized as the leading distributor in the construction segment, although it participated in all three segments. Lansco participated in all segments as well, although it was much smaller than Rockwood. Hoover was, by far, the smallest of the three distributors. It primarily was involved in the coatings segment, although it did have a presence in the construction products segment.

2. Davis Colors handled Rockwood's sales in the construction products segment; Mineral Pigments handled Rockwood's sales in the coatings segment. Paris Affidavit at ¶ 8.

3. In its Complaint, Hoover sought damages for discriminatory pricing from January 1, 1982 until September 23, 1992 (Count I), from September 23, 1992 until September 23, 1996 (Count II), and for prospective discriminatory pricing from September 23, 1996 until March 1, 1998. By Order entered July 24, 1997, I limited any prospective recovery by Hoover to the period after September 23, 1992 because of the four year statute of limitations. Additionally, Hoover

## BACKGROUND

Bayer [formerly known as Miles; formerly known as Mobay] produces and sells synthetic iron oxide pigments under the trade name "Bayferrox." Bayferrox is used in various segments of the pigment industry, but primarily in the construction products segment, the coatings segment, and the plastics segment.[1] Bayer sells Bayferrox directly to end-users. During the time of the alleged price discrimination, Bayer also sold Bayferrox to distributors who then resold the Bayferrox to subdistributors and end-users. Hoover Color Corporation, Rockwood Industries [also known as Davis Colors; also known as Mineral Pigments],[2] and Landers–Segal Color Company [hereinafter Lansco] were distributors of Bayferrox.

Hoover claims that, from 1992 through 1996, Bayer sold Bayferrox to Rockwood and Lansco at lower net prices per pound than to Hoover.[3] These lower prices occurred as a result of a volume discount schedule which Bayer has included in its distributor contracts since 1980.[4] All three distributors purchased under the same basic discount schedule. Rockwood and Lansco purchased higher volumes of Bayferrox than Hoover, thus, they were able to obtain the pigment at a lower net price per pound. Hoover contends that, by way of the operation of the

concedes that no damages could have occurred after December 31, 1996, since Hoover was the only distributor after that date.

4. Rockwood and Bayer entered into the first contract with a volume discount schedule in 1980. That same basic volume discount schedule was provided to Lansco and Hoover in 1981, although Lansco and Hoover purchased at far lower volumes than Rockwood.

Rockwood and Bayer renegotiated their contact in 1985. This volume discount schedule was provided to Lansco and Hoover in 1987. Again, however, Lansco and Hoover purchased less Bayferrox than Rockwood.

Rockwood and Bayer renegotiated their contract again in 1990 and 1994, and both times the price per pound increased. This same basic volume discount schedule also was provided to Lansco in 1994. Hoover never purchased under the terms of the latest discount schedule. Even though Rockwood's and Lansco's price per pound increased in 1994, their higher volume allowed them to continue to purchase Bayferrox at a lower price than Hoover.

discount mechanism, the prices paid by Rockwood and Lansco, while theoretically available to all distributors, were functionally available only to Rockwood and Lansco.

Under the discount mechanism, a distributor's price per pound of Bayferrox for a given year was set at the beginning of that year.[5] A distributor's discounted price for the given year was based upon the amount of Bayferrox purchased by the distributor during the previous year. If the distributor actually purchased more in the given year than it had in the previous year, then Bayer would reimburse the distributor for the amount of discount actually earned. The reimbursement would be paid by March of the next year. If the distributor purchased less than had been anticipated, however, it would have to return a portion of the estimated discount to Bayer.

For example, if Hoover had purchased four million pounds of Bayferrox in 1988, then it would have received the corresponding two percent discount in 1989.[6] If Hoover bought six million pounds in 1989, then by March of 1990, it would be reimbursed the difference between the 2% discount Bayer estimated Hoover would earn and the 3% discount Hoover actually earned. If, however, Hoover only purchased two million pounds, then it would be required to reimburse Bayer for its failure to purchase sufficient Bayferrox to earn the 2% discount.

Hoover claims that the discount mechanism prevented uniform pricing at the beginning of each year. According to Hoover, the fact that it would not receive a rebate on its discount for fifteen months prohibited it from purchasing an increased volume of Bayferrox. In other words, Hoover contends that the method of setting a discount for a given year based on the volume purchased in the prior year rendered the higher volumes functionally unavailable to Hoover and, thereby, denied Hoover the opportunity to purchase at the same price as Lansco or Rockwood.

## DISCUSSION

Hoover brings this action for price discrimination under § 2(a) of the Clayton Act, as amended by the Robinson–Patman Act. That section provides as follows:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

15 U.S.C.A. § 13(a).

A plaintiff must prove several elements to hold a seller liable for price discrimination under § 2(a). First, the seller must be "engaged in commerce," the price discrimination must occur "in the course of such commerce," and at least one of the sales constituting the discrimination must occur "in commerce." Second, the discrimination must involve contemporaneous "sales" to two or more purchasers at different prices. Third, the items sold must be "commodities of like grade and quality." Fourth, there must be a reasonable possibility that the discriminatory prices will substantially lessen competition, or injure, destroy, or prevent competition. Additionally, in order to recover damages under § 4 of the Clayton Act, a private plaintiff who has proved a violation of § 2(a) must also demonstrate that it suffered actual injury to its business or property as a

---

5. The price per pound was the published list price for the Bayferrox, minus a standard discount provided to all distributors, minus the estimated volume discount to be earned by each distributor.

6. The figures in this example are based upon the discount schedule included in the 1987 Bayer–Hoover Agreement.

result of the price discrimination. *See, e.g., Texaco, Inc. v. Hasbrouck,* 496 U.S. 543, 556, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990) (listing requirements for prima facie case); *Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 434–38, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983) (discussing § 2(a) damages); *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.,* 451 U.S. 557, 561–62, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) (discussing requirement of § 4 actual antitrust damages).

Bayer brings the present motion for summary judgment. For the purposes of this motion, Bayer admits that: (1) Bayferrox is a commodity; (2) Bayer sold Bayferrox in interstate commerce to Rockwood, Lansco, and Hoover; (3) the Bayferrox sold to Rockwood, Lansco, and Hoover was of like grade and quality; and (4) Bayer contemporaneously sold Bayferrox to Rockwood, Lansco, and Hoover at different prices.

In its motion, Bayer argues that Hoover has failed to put forward any evidence to support its damages claims. First, Bayer contends that Hoover's evidence fails to demonstrate that the price differentials had any reasonable possibility of substantially injuring competition under § 2(a). Second, Bayer contends that even if Hoover could establish a violation of § 2(a), Hoover produced no evidence that its business or property has suffered a § 4 injury as a result of the price differential.

In addition to challenging Hoover's ability to establish a prima facie claim of price discrimination, Bayer asserts that it has established two affirmative defenses, either of which would defeat plaintiff's claim. First, Bayer asserts that the lower prices for Rockwood and Lansco were legal under § 2(b) because they were "made in good faith to meet an equally low price of a competitor...." 15 U.S.C.A. 13(b). Second, Bayer asserts that Rockwood's and Lansco's prices were functionally available to Hoover since they purchased Bayferrox under the same basic discount schedule.

For the purposes of this motion, I will assume without deciding, that Hoover has

come forward with sufficient evidence to state a prima facie case for price discrimination. Having assumed that Hoover has set forth a prima facie case of price discrimination, I will examine Bayer's claimed affirmative defenses. In granting the motion for summary judgment, I only need to discuss the "meeting competition" defense of § 2(b).[7]

## I. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment should be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.) (citations omitted), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"While Rule 56 is to be applied to antitrust cases no differently from how it is applied to other cases, that is not to say that the summary judgment device is not an appropriate and useful tool for resolving antitrust cases. On the contrary, because of the unusual entanglement of legal and factual issues frequently presented in antitrust cases, the task of sorting them out may be particularly well-suited for Rule 56 utilization." *Thompson Everett, Inc. v. National Cable Advertising,* 57 F.3d 1317, 1322 (4th Cir.1995) (citation omitted). The appropri-

---

**7.** I do not decide, therefore, whether or not Hoover has put forward evidence of possible competitive injury under § 2(a) or actual antitrust injury under § 4, or whether Rockwood's and Lansco's prices were functionally available to Hoover.

ateness of granting summary judgment on a § 2(b) defense is often debated, however. *Compare Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1425 (11th Cir.1990) ("[U]nder summary judgment involving section 2(b) a legal conclusion that the meeting competition defense has been established is rarely, if ever, reachable.") *with Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 42–43 (7th Cir.1992) ("[W]e must remember that courts traditionally have been quite circumspect in permitting a grant of summary judgment when claims of good faith and belief are involved— especially when the moving party has the burden of establishing that fact at trial.... While these latter considerations require our careful attention, we must also remember that certain characteristics of the 'meeting competition' defense ... make application of these summary judgment criteria somewhat more judicially manageable than might be the case in other contexts.") (citations omitted). Thus, while the posture of this case may require a harder look at the evidence presented by both sides, summary judgment remains appropriate where the facts clearly establish that the seller's lower prices were a good faith response to competition. *See Reserve Supply*, 971 F.2d at 42 (Since defendants bear burden of proving good faith at trial, they "must show that the evidence of their good faith is 'so one-sided that ... [they] must prevail as a matter of law.'") (*quoting Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. 2505); *see also Walker v. Hallmark*

*Cards, Inc.*, 992 F.Supp. 1335, 1340–42 (M.D.Fla.1997) (granting summary judgment on § 2(b)); *Bryant Corp. v. Outboard Marine Corp.*, 1995–1 Trade Cas. (CCH) ¶ 70,-903, 1994 WL 745159, at *4–*6 (W.D.Wash. 1994) (same), *aff'd*, 77 F.3d 488, 1996 WL 48401 (9th Cir.1996); *Krieger v. Texaco, Inc.*, 373 F.Supp. 108, 112 (W.D.N.Y.1972) (same); *McCaskill v. Texaco, Inc.*, 351 F.Supp. 1332, 1340 (S.D.Ala.1972) (same), *aff'd sub nom. Harrelson v. Texaco, Inc.*, 486 F.2d 1400 (5th Cir.1973).

## II. Meeting Competition Defense to a § 2(a) Price Discrimination Claim

Pursuant to § 2(b) of the Clayton Act, as amended by the Robinson–Patman Act, nothing "shall prevent a seller rebutting the prima facie case thus made by showing that his lower price ... was made in good faith to meet an equally low price of a competitor ...." 15 U.S.C.A. 13(b). The meeting competition defense "allows a seller to 'set its lower price [to a second line buyer in competition with another buyer] in good faith to meet an equally low price of [the seller's] competitor' without violating the price discrimination prohibitions of the [Robinson–Patman Act]." *Walker*, 992 F.Supp. at 1340 (brackets in original) (citation omitted). "When proved, the meeting-competition defense of § 2(b) exonerates a seller from Robinson–Patman Act liability." *Falls City*, 460 U.S. at 438, 103 S.Ct. 1282 (*citing Standard Oil Co. v. FTC*, 340 U.S. 231, 246–47, 71 S.Ct. 240, 95 L.Ed. 239 (1951)).[8]

**8.** In passing the Robinson–Patman Act, Congress intended to limit quantity price differentials, otherwise permissible under the Clayton Act, "to the sphere of actual cost differences. Otherwise, ... such differentials would become instruments of favor and privilege and weapons of competitive oppression." *FTC v. Morton Salt Co.*, 334 U.S. 37, 43–44, 68 S.Ct. 822, 92 L.Ed. 1196 (1948) (*quoting* H.R.Rep. No. 74–2287 at 9 (1936)). This limitation on price differentials was intended to protect small purchasers from the dominant market position and purchasing power of large purchasers. *Id.* at 49, 68 S.Ct. 822 ("[I]n enacting the Robinson–Patman Act, Congress was especially concerned with protecting small businesses which were unable to buy in quantities."); *see also Great Atlantic & Pacific Tea Co., Inc. v. FTC*, 440 U.S. 69, 75–76, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979) ("The Robinson–Patman Act was passed in response to the problem perceived in the increased market power and coercive

practices of chainstores and other big buyers that threatened the existence of small independent retailers.")

In addition to tightening restrictions on price discriminations, however, Congress also included the meeting competition exception, which seems to swallow the rule to a great extent. The meeting competition defense permits exactly what § 2(a) was amended to prohibit: large purchasers using their greater purchasing power to force sellers to sell their goods to the large purchasers at prices lower than the sellers sell to small purchasers. It seems to me, that in a case such as the one at bar, where the seller can document competition in the market and the threat of reduced sales as a result of that competition, Congress' goals in passing Robinson–Patman are effectively circumvented and the seller necessarily can not be held liable for price discrimination. *See generally Great A & P Tea Co.*, 440 U.S. at 82–85, 99 S.Ct. 925.

] Bayer contends that it sold Bayferrox to Rockwood and Lansco at lower prices in a good faith attempt to meet an equally low price of competitors. Bayer bears the burden of establishing this defense. *Reserve Supply,* 971 F.2d at 41 (*citing Falls City,* 460 U.S. at 451, 103 S.Ct. 1282). At the summary judgment stage, "the burden in the context of the meeting competition defense is on the defendant to 'establish that the *evidence supported only one reasonable conclusion* —that its lower prices were a good faith response to competition.'" *Zoslaw v. MCA Distributing Corp.,* 594 F.Supp. 1022, 1032 (N.D.Calif.1984) (*quoting William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1045 (9th Cir.1981) (emphasis in original)).

## A. Applicable Standard

The Supreme Court repeatedly has addressed what a seller must prove in order to succeed with a meeting competition defense. The "meeting-competition defense requires the seller at least to show the existence of facts that would lead a reasonable and prudent person to believe that the seller's lower price would meet the equally low price of a competitor...." *Falls City,* 460 U.S. at 451, 103 S.Ct. 1282. The defense "also requires the seller to demonstrate that its lower price was a good-faith response to a competitor's lower price." *Id.*

 "The standard of good faith is simply the standard of the prudent businessman responding fairly to what he reasonably believes is a situation of competitive necessity." *Id.* at 441 (*quoting Continental Baking Co.,* 63 F.T.C. 2071, 2163 (1963)). "Whether this standard is met depends on 'the facts and circumstances of the particular case, not abstract theories or remote conjectures.'" *Id.* (*quoting United States v. U.S. Gypsum Co.,* 438 U.S. 422, 454, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)). "[A] showing of facts giving rise to a reasonable belief that equally low prices were available to the favored purchaser from a competitor will be sufficient to establish

that the seller's lower price was offered in good faith to meet that lower price." *Id.* at 439, 103 S.Ct. 1282.[9]

In *Gypsum,* the Supreme Court provided a non-exhaustive list "of factors that could be relevant to determining a seller's good faith, including (1) whether the seller had received reports of similar discounts from other customers, (2) whether the seller was threatened with a termination of purchases if the discount were not met, (3) whether the seller made efforts to corroborate the reported discount by seeking documentary evidence or by appraising its reasonableness in terms of available market data, and (4) whether the seller had past experience with the buyer." *Reserve Supply,* 971 F.2d at 42 (*citing Gypsum,* 438 U.S. at 455, 98 S.Ct. 2864).

"Nothing in § 2(b) requires a seller to *lower* its price in order to meet competition.... In a period of generally rising prices, vigorous price competition for a particular customer or customers may take the form of smaller price increases rather than price cuts. Thus, a price discrimination created by selective price increases can result from a good faith effort to meet a competitor's low price." *Falls City,* 460 U.S. at 444, 103 S.Ct. 1282 (emphasis in original).

Also, "[a] seller is permitted to retain a customer by realistically meeting in good faith the price offered to that customer, without necessarily changing the seller's price to its other customers. The plain language of § 2(b) also permits a seller to retain a customer by realistically meeting in good faith the price offered to that customer, without necessarily freezing his price to his other customers." Indeed, "[t]he very purpose of the defense is to permit a seller to treat different competitive situations differently. The prudent businessman responding fairly to what he believes in good faith is a situation of competitive necessity might well raise his prices to some customers to increase is profits, while meeting competitors' prices by keeping his prices to other customers low."

9. It is clear that the meeting competition defense only entails an analysis of the relevant market and the conduct of the favored purchasers, the seller, and the seller's competitor. These are analyzed to determine whether a reasonable and

prudent seller would have believed that the lower price was necessary to meet competition. The defense does not entail an analysis of any alleged harm suffered by the disfavored purchaser or the seller's treatment of the disfavored purchaser.

*Id.* at 444–45, 103 S.Ct. 1282 (internal citations and quotations omitted).

■ Additionally, the meeting competition defense is equally applicable to a seller attempting to retain an old customer or a seller attempting to gain a new customer. *Id.* at 446, 103 S.Ct. 1282. A seller also is not required to meet competition on a customer-by-customer basis in order to take advantage of the meeting competition defense. *Id.* at 448, 103 S.Ct. 1282 ("We conclude that Congress did not intend to bar territorial price differences that are in fact responses to competitive conditions.").

■ Finally, a seller must investigate in an attempt to verify the competitor's offer. *F T C v. A.E. Staley Mfg. Co.*, 324 U.S. 746, 758, 65 S.Ct. 971, 89 L.Ed. 1338 (1945); *see also Gypsum*, 438 U.S. at 451–52, 98 S.Ct. 2864. This obligation, however, is limited by the prohibitions of the Sherman Act. *See Great A & P Tea Co.*, 440 U.S. at 84, 99 S.Ct. 925 (The seller "could not then attempt to verify the existence and terms of the competing offer from [its competitor] without risking Sherman Act liability."). Open sharing of price information among competitors will tend to stabilize prices, *Gypsum*, 438 U.S. at 457–58, 98 S.Ct. 2864, and lead to "the growth of prohibited anticompetitive activity." *Id.* at 458, 98 S.Ct. 2864. Thus, "[a] good faith belief, rather than absolute certainty, that a price concession is being offered to meet an equally low price offered by a competitor is sufficient to satisfy the § 2(b) defense." *Id.* at 453, 98 S.Ct. 2864. "Since good faith, rather than absolute certainty, is the touchstone of the meeting-competition defense, a seller can assert the defense even if it has unknowingly made a bid that in fact not only met but beat is competition." *Great A & P Tea Co.*, 440 U.S. at 83, 99 S.Ct. 925 (*citing Gypsum*, 438 U.S. at 454, 98 S.Ct. 2864).

### B. Application of the Standard

In analyzing the law of the meeting competition defense and the facts of the case at bar, I "must determine whether [Bayer has] shown 'the existence of facts that would lead a reasonable and prudent person to believe that [its] lower price would meet the equally low price of a competitor' and whether [it has] demonstrated that [its] 'lower price was a good faith response to a competitor's lower price.'" *Reserve Supply*, 971 F.2d at 43 (*citing Falls City*, 460 U.S. at 451, 103 S.Ct. 1282). In doing so, I must keep in mind the indicia of good faith enumerated in *Gypsum*. *Id.*

### i) The 1980 Bayer–Rockwood Agreement

The material facts regarding the negotiation of the 1980 Bayer–Rockwood Agreement are uncontested.[10]

■ Hoover, Rockwood, and Lansco were among several Bayferrox distributors in the 1970's and 1980's. During the 1970's, Bayer produced Bayferrox in West Germany. In late 1980, Bayer opened a new Bayferrox production facility in New Martinsville, West Virginia. McCormack Dep., Vol. I, at 13. The facility had high fixed costs, irrespective of the volume of Bayferrox produced at the facility. The marginal cost of each additional pound of Bayferrox was minimal, however. Because of the high fixed costs, Bayer needed to maximize production at the facility to generate a profit. Meikle Affidavit at ¶ 6; Noble Affidavit at ¶ 4; *see also* McCormack Dep., Vol. I, at 128. To maximize utilization of the West Virginia facility, Bayer sought to lock its distributors into long term commitments to buy Bayferrox. Stroucken Dep. at 73–74; Meikle Affidavit at ¶¶ 7–8; Noble Affidavit at ¶ 5; McCormack Dep., Vol. I, at 128. Volume discounts were viewed as a possible incentive for distributors to increase their purchases of Bayferrox. Meikle Affidavit at ¶ 8; Noble Affidavit at ¶ 5; Stroucken

**10.** In this price discrimination action, I am concerned only with the years 1992 through 1996. Nonetheless, the relationship between the principals and the development of the industry throughout the 1980's and 1990's is relevant to my resolution of this issue. *See Gypsum*, 438 U.S. at 455, 98 S.Ct. 2864 (reasonableness of threat given the condition of the market and history between seller and favored purchaser are relevant to determination of good faith); *Great A & P Tea Co.*, 440 U.S. at 84, 99 S.Ct. 925 (an established business relationship is relevant to determination of good faith).

Dep. at 73–74, 144; McCormack Dep., Vol. I, at 128.

Bayer first approached Rockwood, its largest distributor, about a long term commitment to purchase Bayferrox. Entering the negotiations, Bayer was aware that Rockwood purchased and distributed substantial quantities of non-Bayferrox synthetic iron oxides. Meikle Affidavit at ¶ 9; McCormack Dep., Vol. II, at 104; Stroucken Dep. at 144. During negotiations, Rockwood informed Bayer that it had offers for lower priced synthetic iron oxides than Bayer was offering. Meikle Affidavit at ¶ 11. Rockwood demanded that Bayer lower its proposed price for Bayferrox, or Rockwood would not commit to purchase high volumes of the Bayferrox. Meikle Affidavit at ¶ 11; Noble Affidavit at ¶ 9. Rockwood also threatened that unless Bayer lowered its proposed prices, Rockwood would increase its purchases of non-Bayferrox synthetic iron oxides and reduce its purchases of Bayferrox. Meikle Affidavit at ¶ 11; Noble Affidavit at ¶ 9.

Bayer had reason to believe Rockwood's threats. First, Bayer officials believed that Rockwood already purchased one-third of its synthetic iron oxide requirements from other sources. Noble Affidavit at ¶ 6.[11] Second, Bayer knew that Rockwood was a leader in the construction materials market. The lower cost alternatives to Bayferrox were more suitable for use in blends for the construction products segment than for the coatings segment. See Stroucken Dep. at 134–36. Thus, Bayer had reason to be concerned that Rockwood could easily use these non-Bayer synthetics as substitutes for Bayferrox. Noble Affidavit at ¶ 11. Third, Bayer verified that synthetic iron oxides were being imported into the country. Meikle Affidavit at ¶ 14; Noble Affidavit at ¶ 10. Fourth, Bayer contacted various end-users who verified the availability of lower cost alternatives to Bayferrox. Meikle Affidavit at ¶ 14; Noble Affidavit at ¶ 10.

Based on these uncontested facts, I have no trouble concluding that, as a matter of law, Bayer's proposed discount pricing schedule was made in a good faith attempt to meet competition for Rockwood's business. Bayer has shown the "existence of facts that would lead a reasonable and prudent person to believe that the seller's lower price would meet the equally low price of a competitor." *Falls City,* 460 U.S. at 451, 103 S.Ct. 1282. Indeed, that is the only reasonable conclusion which the evidence supports. *See Zoslaw,* 594 F.Supp. at 1032.

As for the good faith requirement, that is exhibited by "a showing of facts giving rise to a reasonable belief that equally low prices were available to the favored purchaser from a competitor." *Falls City,* 460 U.S. at 439, 103 S.Ct. 1282. Such facts have been demonstrated here. Also, given Bayer's need to maximize productivity at its West Virginia facility, it is clear that Bayer was responding to a "competitive necessity" by meeting the price offered to Rockwood. *See id.* at 441, 103 S.Ct. 1282; *see also Great A & P Tea Co.,* 440 U.S. at 73, 99 S.Ct. 925 (need to maximize utilization of new facility may be considered in good faith determination). The indicia of good faith enumerated in *Gypsum* also dictate this result. 438 U.S. at 455, 98 S.Ct. 2864; *see also Reserve Supply,* 971 F.2d at 42. First, Bayer asked various end-users whether or not they were aware of lower priced synthetic iron oxides on the market. Second, while they were not threatened with an outright termination of purchase by Rockwood, they were threatened with a reduction in Bayferrox purchases if the discount were not met. Third, Bayer corroborated the availability of imported synthetic iron oxides in the market.

Finally, the price offered by Bayer was obviously geared towards "meeting" the competitive price offered to Rockwood. Bayer conducted a thorough market analysis to determine what price to offer Rockwood to retain their existing business, earn new business, and still turn a profit. *See* Meikle Affidavit at ¶¶ 15–17; Meikle Affidavit Exhibit A; Noble Affidavit at ¶ 13.

Given Bayer's need to maximize utilization at the West Virginia facility and its determi-

---

**11.** Rockwood purchased around 19 million pounds of Bayferrox in 1980, Defendant's Exhibit C–3, and in 1980 Bayer was made aware that Rockwood purchased "something like ten million pounds from other sources." Stroucken Dep. at 144.

nation of the reasonableness of the alleged lower price in light of the market, the only reasonable conclusion is that Bayer offered the lower price to Rockwood in a good faith attempt to meet a competitor's low price.

### ii) The 1985 Bayer–Rockwood Agreement

The uncontested material facts also support the conclusion that, as a matter of law, Bayer's proposed discount pricing schedule in 1985 was made in a good faith attempt to meet competition for Rockwood's business.

During the 1985 negotiations, Rockwood again threatened Bayer that it would shift its purchases of synthetic iron oxides away from Bayer and to cheaper alternatives, if Bayer did not offer competitive prices. Noble Affidavit at ¶ 16. Rockwood informed Bayer that Rockwood was "facing strong pressure from imported products which were selling substantially lower than [Bayer's] and Rockwood's current price levels. Furthermore, [Rockwood] indicated that domestic suppliers (Columbian and Pfizer) were being more aggressive by offering special incentives in some cases." Bayer Exhibit, Vol. II, C–2, at BC 001374. From its internal memoranda, its is evident that Bayer continued to recognize that Rockwood's ability to substitute cheaper synthetic oxides for Bayferrox in its production of pigment for the construction products (concrete) segment posed a "substantial threat" to Bayer. Bayer Exhibit, Vol. II, C–3, at BC 001716–17. The "substantial threat" existed, in part, because Bayer still was not fully utilizing the capacity of the West Virginia facility, and the plant remained "extremely dependent on high volume utilization to achieve profitability." Stroucken Dep. at 49.

Again, I find that the uncontested facts support only a conclusion that the price terms offered by Bayer during the 1985 negotiations were made in a good faith attempt to meet competition for Rockwood's business. Regarding the element of good faith, the competitive necessity created by the West Virginia facility still existed, and the facts demonstrate that lower prices were available to the favored purchaser. *See Falls City,*

460 U.S. at 441, 439, 103 S.Ct. 1282. Also, applying the *Gypsum* criteria, I find that the evidence requires a finding that Bayer acted in good faith. 438 U.S. at 455, 98 S.Ct. 2864; *see also Reserve Supply,* 971 F.2d at 42. First, Rockwood again threatened to reduce its purchases of Bayferrox if Bayer did not present a competitive price. Second, Bayer corroborated the report by analyzing the availability and impact of low cost substitutes for Bayferrox. Finally, Bayer's dealings with Rockwood during the 1980 negotiations weigh heavily in favor of Bayer's good faith.

### iii) The 1981 and 1987 Bayer– Lansco Agreements

In 1981 and 1987, respectively, Bayer extended the same basic volume discount schedule included in the 1980 and 1985 Bayer–Rockwood Agreements to Lansco and Hoover.[12] Bayer clearly was under no obligation to lower its price to Lansco and Hoover or to provide them with the same discount schedule as Rockwood. *Falls City,* 460 U.S. at 445, 103 S.Ct. 1282 ("The very purpose of the [meeting competition] defense is to permit a seller to treat different competitive situations differently."). Nonetheless, Bayer chose to do so.

Hoover argues that since Bayer did not have to lower its prices to Lansco and Hoover, but it did nonetheless, Bayer must not have been motivated by competition when it lowered prices to Rockwood. According to Hoover, Bayer must have been motivated solely by another interest, namely the maximization of production at the West Virginia facility. I disagree. It is uncontested that, in its negotiations with Rockwood, Bayer was motivated by its desire to maximize productivity at the West Virginia plant. The exigencies of the West Virginia facility were an added incentive, for Bayer to maximize sale of Bayferrox by meeting competition. *See Great A & P Tea Co.,* 440 U.S. at 73, 99 S.Ct. 925 (need to maximize utilization of new facility supports finding that it was competitive necessity for seller to match competing offers for buyer's business). During the negotia-

---

**12.** Hoover bought less Bayferrox than Rockwood and Lansco, so it paid more per pound under the discount schedule.

tions commenced by Bayer, however, Rockwood parlayed the availability of lower cost substitutes for Bayferrox into a demand that Bayer provide Bayferrox at a competitive price or lose a substantial portion of Rockwood's business. The availability of these alternatives to Bayferrox were well known throughout the industry, and Bayer correctly assumed that Lansco and Hoover had access to these substitutes. *See* McMahon Dep. at 122 (lower cost alternatives could be obtained "by any distributors."). Therefore, in providing the same discount schedule to Lansco and Hoover as it had provided to Rockwood, Bayer was continuing to meet competition. *See Falls City*, (lower price need not be set on customer-by customer basis). In fact, I find Bayer's willingness to extend the same advantageous discount schedule to Lansco and Hoover indicative of Bayer's good faith during negotiations in the 1980's and 1990's. *See* Hoover Dep. at HCC SJ 520 (Bayer stated that its intention was to provide a level playing field, where all distributors had the same pricing and discounts.); *see* Stroucken Dep. at HCC SJ 1144 (Hoover's volume discount schedule was "part of a distribution schedule that applies to all distributors, and that are volume-driven in the purchases."); McMahon Dep. at 114 (Bayer tried to "handl[e] things ... neutrally, fairly among all the distributors.").

This finding of good faith is strengthened by the fact that Bayer did not view Hoover as a significant participant in the concrete segment of the industry. Ali Dep. at 79–80; McCormack Dep., Vol. II, at 41–42; McMahon Dep. at 116–17; Papich Dep. at 135–37. Bayer believed that Hoover was principally involved with natural iron oxides, and that Hoover used synthetic iron oxides to blend with the natural iron oxides and correct any variability in their color. McMahon Dep. at 118; *see also* Bayer Exhibit, Vol. I, B–7, at 02933. Conversely, Bayer officials believed that Lansco was as focused on the construction products segment as the coatings seg-

ment. Ali Dep. at 79–80. Thus, even though Hoover was not as capable of taking advantage of the imports as Lansco and Rockwood, Bayer still offered the same volume discount schedule to Hoover.

Finally, even though Lansco did not threaten to reduce its purchases of Bayferrox in 1987, it is clear that an actual threat to reduce purchases is not required in order to take advantage of the meeting competition defense. Since meeting competition defense can be used in lowering prices to purchasers who have never before purchased from the seller, it cannot be argued that a purchaser must threaten to decrease its purchases from a seller in order to use the meeting competition defense. *See Falls City*, 460 U.S. at 446–47, 103 S.Ct. 1282 ("[A] seller's response must be defensive, in the sense that the lower price must be calculated and offered in good faith to 'meet not beat' the competitor's low price. ... Section 2(b), however, does not distinguish between one who meets a competitor's lower price to retain an old customer and one who meets a competitor's lower price in an attempt to gain new customers.") (quotations and citations omitted).

Thus, I find that the uncontested evidence would lead a reasonable and prudent person to believe that Bayer's lower price to Lansco was intended to meet equally low prices available from the seller's competitors in the marketplace.

### iv) The 1990 Bayer–Rockwood Agreement

Imports of low cost synthetic iron oxides continued to increase during the late 1980's and early 1990's. *See* Bayer Exhibit, Vol. I, B–4, at BC 002621 ("The decrease in our sales to distributors from 1989–91 reflects the economic recession, and the purchases by Rockwood of low priced material imported from China.") These imports were more suitable as substitutes in the expanding construction products segment of the market than in the coatings segment.[13] The com-

---

**13.** *See* Bayer Exhibit, Vol. II, C–6, at BC 002558 ("Coating is no longer the critical factor to the rise or fall of global iron oxide pigment market, the critical factor is now the construction indus-

try. Since 1980, global construction industry (especially western Europe and north America) is in the ascendant, which caused the global iron oxide pigment market blooming.").

bined market pressures of increasing imports and growth of the construction segment were present when Rockwood and Bayer renegotiated their supply agreement in 1990.[14]

During the negotiations, Rockwood complained that the changing market dynamics forced them to increasingly compete against lower cost material. McMahon Dep. at 121. Rockwood indicated that it would begin searching for alternate sources of synthetic iron oxides. Bayer Exhibit, Vol. I, B–13. Rockwood advised Bayer that it could still obtain lower cost substitutes for Bayferrox. Paris Affidavit at ¶ 9; Stroucken Dep. at 110; McCormack Dep., Vol. II, at 40; McMahon Dep. at 121. Bayer relied upon Rockwood's concerns in offering the prices included in the 1990 Bayer–Rockwood Agreement. McMahon Dep. at 121–22. I find that these uncontested facts, viewed in the context of the changing market and the factors enumerated in *Gypsum*, leave as the only reasonable conclusion that Bayer altered its price structure during the 1990 negotiations in an attempt to meet competition from foreign producers for Rockwood's business.

**14.** The 1985 contract had a five-year life, but, it could be continued indefinitely. Because "the market dynamics were changing," the 1985 five-year contract was not continued. McMahon Dep. at 92–94; *see also* Stroucken Dep. at 110.

**15.** Hoover contends that Bayer could not have been "meeting competition" in the 1990's if it refused to meet this Chinese offer. I disagree. The meeting competition defense does not require a seller to meet *all* competition. The defense protects a seller from being forced to choose between a decision to not meet a lower price or a decision to provide all purchasers the same lower price, either of which could be ruinous. *See Falls City*, 460 U.S. at 444–45, 103 S.Ct. 1282. It is illogical then to hold a seller to a requirement that, in order to take advantage of the meeting competition defense, he meet all lower prices, when such a price itself could be ruinous.

**16.** It is unclear whether Bayer ever met this offer, or whether Rockwood ended up purchasing from the supplier.

**17.** It is unclear whether the letter refers to a lower cost European substitute, *see* Bayer Exhibit, Vol. I, B–15, at BC 001943, or a lower cost Chinese substitute, *see* Rapaport Dep. at 80–86.

**18.** In 1992, Rockwood's business was 60% to 66% in the construction business. Rapaport

### v) The 1994 Bayer–Rockwood and Bayer–Lansco Agreements

■ The availability of the lower cost imports increased dramatically in the 1990's. Just weeks after negotiating the 1990 contract extension, Rockwood notified Bayer of a Chinese offer to sell synthetic iron oxide at a price much lower than provided in the Bayer–Rockwood Agreement. The offer was so low, in fact, that Bayer was incapable of matching it. *See* Bayer Exhibit, Vol. I, B–14.[15] On February 13, 1992, Rockwood again notified Bayer that it had received an offer form a foreign source to sell synthetic iron oxides at a lower price than the price under the 1990 Bayer–Rockwood Agreement. Bayer Exhibit, Vol. I, B–5, at BC 002491; *see also* Bayer Exhibit, Vol. I, B–15; Bayer Exhibit, Vol. I, B–16; Paris Affidavit at ¶ 12.[16] This letter was prompted by Rockwood's concern about Bayer's price of Bayferrox and the lower cost imported pigments. Rapaport Dep. at 83–84.[17] Rockwood was concerned that these low cost pigments could dramatically impact the construction side of the business. Rapaport Dep. at 83.[18] These are just two examples of how the amount of imported synthetic iron oxides dramatically increased in the early 1990's.[19]

**19.** For a further discussion on the increase of foreign iron oxides in the 1990's, see generally Bayer Exhibit, Vol. II, C–6, at BC 002538–BC 002542; Paris Affidavit at ¶¶ 10–12; McCormack Dep:, Vol. II, at 40, 107; Rapaport Dep. at 80–86, 140, 142–43; Bayer Exhibit, Vol. I, B–5, at BC 002490 (Rockwood has "monitored the U.S. efforts of foreign Iron Oxide manufacturers and agents and have seen their presence increase.").

Bayer felt the effects of the increased availability of imported synthetic iron oxides in a decline in purchases by Rockwood. From 1991 through 1995, Rockwood dramatically increased its purchases of imported synthetic iron oxides, *see* Bayer Exhibits, Vol. II, C–13, at BC 003559; Paris Affidavit at ¶ 4, while its purchases of Bayferrox declined, *see* Rapaport Dep. at 23 (Between 1992 and 1996, Rockwood "decreased [its] dependence and consumption on the Bayferrox and increased [its] utilization of other pigments."), 30 (Rockwood's purchases of Bayferrox remained "significant, but declin[ed] each year" after 1992), 44 (purchases of Bayferrox "declined during the period 1992 to 1996 as we made ourselves available to other sources of material"). In the same period, Lansco's purchases of imported synthetic iron oxides increased by 400%. The impact was not limited to Rockwood and Lansco. Imports rose from 10% of the total market for synthetic iron oxides in 1991 (17.8 million pounds) to 22% in 1994 (49.3 million

While there was an increase in imports which presented problems for Bayer, there also was a consolidation of producers and distributors in the 1990's which troubled Bayer. In 1992, Rockwood was acquired by Laporte, a construction products manufacturer. Additionally, in the early 1990's, Laporte was considering purchasing Silo and Columbian, manufacturers of synthetic iron oxides. These acquisitions would make Laporte a fully vertically integrated competitor of Bayer. Bayer was concerned that these acquisitions would lead to a further decrease in Rockwood's purchases of Bayferrox. *See* Bayer Exhibit, Vol. I, B–2 ("Between 60% and 75% of Rockwood's Bayferrox purchases could be replaced in 2–3 years by Silo, Columbian and Chinese materials.... If [Bayer] were unable to regain this volume in the marketplace, the profit impact to [Bayer] alone would be sever [sic]."); Bayer Exhibit, Vol. II, C–1, at BC 000388 (The "loss of volume [caused by Laporte's acquisition of Silo] would significantly impact Bayer/Miles' sales and profitability. This situation is particularly critical in North America, because of Laporte's recent acquisition of our largest Bayferrox distributor, Rockwood."), at BC 000389 ("Rockwood's purchases of Bayferrox are critical to the financial success of our North American Pigments business, and to our market leadership position in the strategically important construction industry. It is critical that we find a way to secure this volume both short and long term."). Laporte purchased Silo in September of 1992. *See* Bayer Exhibit, Vol. I, B–2.

Because of the threats to its distribution network Bayer decided to restructure the network. *See* Bayer Exhibit, Vol. I, B–2, at BC 002445; Bayer Exhibit, Vol. I, B–3, at BC 002445; McCormack Dep. at 20–24, 34–35. Bayer decided to reduce its dependence on outside distributors. *See* Bayer Exhibit, Vol. I, B–3, at BC 002445; Bayer Exhibit, Vol. I, B–4, at BC 002621 ("The trend in [Bayer's] sales toward a high portion of direct sales reflects the business group's ef-

forts to reduce the dependence on distributor sales.").[20]

The continued increase in imports and the consolidation of the industry presented further difficulties for Bayer because its objective remained the maximum utilization of the West Virginia facility. McCormack Dep., Vol. I, at 128–29. Facing these competitive pressures, Bayer again renegotiated its contracts with Rockwood and Lansco in 1994, several years after Laporte's acquisition of Rockwood and before Bayer's acquisition of Lansco.

During the negotiation of the 1994 Bayer–Rockwood Agreement, it is clear that Rockwood, either explicitly or implicitly, threatened to, and in fact did, reduce its purchases of Bayferrox. *See* McCormack Affidavit at ¶ 6; *see also Reserve Supply*, 971 F.2d at 45–46 (possibility of loss of business which "was clearly implicit within the [relevant] market" was sufficient "threat" under § 2(b)). Given the changes in the international market for synthetic iron oxides and Bayer's continued need to maximize productivity at its West Virginia facility, Bayer was in a "situation of competitive necessity" and was justified in meeting the competitive offers made to Rockwood. *See Falls City*, 460 U.S. at 441, 103 S.Ct. 1282.

■ Hoover contends that the fact that the 1990 and 1994 negotiations resulted in actual price increases precludes Bayer from invoking the meeting competition defense. Clearly, this argument is incorrect. "Nothing in § 2(b) requires a seller to *lower* its price in order to meet competition.... A seller is required to justify a price difference by showing that it reasonably believed that an equally low price was available to the purchaser and that it offered the lower price for that reason; the seller is not required to show that the difference resulted from subtraction rather than addition.... In a period of generally rising prices, vigorous price competition for a particular customer or customers may take the form of smaller price increases rather than price cuts. Thus, a

---

pounds). *See* Bayer Exhibit, Vol. II, C–13, at BC 003559.

20. Bayer eventually canceled its contracts with Rockwood (effective January 1, 1997) and Hoover (effective January 1, 1998), and acquired Lansco (October of 1996).

price discrimination created by selective price increases can result from a good faith effort to meet a competitor's low price." *Falls City*, 460 U.S. at 444, 103 S.Ct. 1282 (emphasis in original). In this case, there is ample evidence that in the late 1980's and early to mid–1990's, prices in the synthetic iron oxide industry were generally increasing. *See* Bayer Exhibit, Vol. I, B–5, at BC 02490 (noting "rising costs of operating and environmental compliance"); Bayer Exhibit, Vol. II, C–6, at BC 002539 (1994 memorandum stating "In the wake of the rapid growth of construction industry, iron oxide pigment has been in rather short supply in the global market for the past few years, and the price has been rising constantly"); Bayer Exhibits, Vol. II, C–6, at BC 002557 ("From early 1990 onwards, due to the cost of energy is rising, the price of synthetic iron oxide worldwide is going up . . . .").

Like Rockwood, Lansco was shifting purchases of synthetic iron oxides away from Bayer and to foreign producers. *See* D. Greenwald, Dep. at 81–82. In fact, Lansco's purchases of Bayferrox dropped from sixteen million pounds to thirteen million pounds in 1993. Lansco substituted Mexican and Chinese oxides for Bayferrox. D. Greenwald, Dep. at 81–82. Given the realities of the market, Bayer was aware that Lansco had competitive offers for synthetic iron oxides from other sources. *See Reserve Supply*, 971 F.2d at 44–46 (view reasonableness of competing offer "in light of market conditions;" "implicit" threats can be inferred from market conditions). In fact, Lansco had informed Bayer that it had been presented with lower offers, and that was one reason offered by Lansco for wanting to renegotiate the agreement. McCormack Dep., Vol. II, at 102; McCormack Affidavit at ¶ 7. These competitive offers concerned Bayer, thus, Bayer reacted with what it believed were competitive counteroffers. McCormack Dep., Vol. II, at 103.

 Hoover argues that Bayer was not motivated to meet competition for Lansco's business in 1994. Hoover contends that Bayer sought to renegotiate the volume discount schedule in an attempt to lower the amount of Lansco's discount and to stabilize the fluctuations in Lansco's demand. Undoubtedly, numerous issues were of particular interest to one party or the other during the negotiation of the 1994 contract. In a complex contract, negotiations will always involve many issues. For example, in the face of increasing prices in the market, Bayer sought to reduce the discount given to Lansco. On the other hand, Lansco sought to prevent any price increase. Bayer also wanted to resolve issues involving a customer of Lansco, Hamburger, and both parties wanted to stabilize Lansco's demand. Lansco hoped to increase its allowable purchases of imported iron oxides. *See* Hoover Exhibit at HCC SJ 0336–358. None of these issues lessen the fact that when Bayer offered its price to Lansco, it did so (1) in light of the developments in the synthetic iron oxides market, including the increase in imports and expansion of the construction products segment, (2) with knowledge, either explicitly or implicitly, that Lansco had access to lower cost substitutes for Bayferrox, and (3) faced with a competitive necessity to maximize production at its West Virginia facility. Despite the other issues addressed in agreeing to the 1994 contract, the material facts, when viewed in the light most favorable to Hoover, could only lead a reasonable and prudent person to believe that Bayer's lower price was offered in a good faith attempt to meet competition for Lansco's business.

Again, the uncontested material facts establish that equally low prices were available to Lansco and Rockwood,[21] and that Bayer was faced with a competitive necessity to meet competition for Lansco's and Rockwood's business.[22] In light of the condition of the synthetic iron oxides market and the factors enumerated by the Supreme Court in

---

**21.** Bayer was aware of other available sources of synthetic iron oxides by way of direct communication from Rockwood and Lansco, past dealings with Rockwood and Lansco, and by inference from its knowledge of the synthetic iron oxides market.

**22.** The competitive necessity was created by the need to maximize productivity at the West Virginia facility.

*Gypsum,* only one reasonable conclusion exists: as a matter of law, Bayer was meeting competition in good faith in 1994 when it effectively offered to sell Bayferrox to Lansco and Rockwood at prices which were lower than the price at which it sold Bayferrox to Hoover.

## CONCLUSION

The uncontroverted evidence regarding the relationship of the principals and the dynamic market for synthetic iron oxides in the 1980's and 1990's clearly establishes that Bayer offered its lower prices to Rockwood and Lansco out of a good faith competitive necessity to meet competition for their business. Hoover fails to present any material evidence to counter this conclusion.

Accordingly, for the aforementioned reasons, the defendant's motion for summary judgment is GRANTED.